Mary **RIVERA**, as personal representative of the Estate of Joseph Rivera, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

**No. 88–1696–CIV.**

United States District Court, S.D. Florida.

Feb. 15, 1990.

Carey Fischer, Fort Lauderdale, Fla., for plaintiff.

Marilyn Koonce, Asst. U.S. Atty., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

Mary Rivera brought this action as personal representative of the Estate of Joseph Rivera, based on the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671 *et seq.* After a full nonjury trial on the merits, this court now enters its findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

Joseph Rivera was admitted to the Veterans Administration Hospital in Miami on April 6, 1986 and underwent cardiac bypass surgery on April 7, 1986. Mr. Rivera died at the Veterans Hospital at approximately 2:40 A.M. on April 10, 1986. He was 54 years old. Mr. Rivera left a wife, Mary Rivera, the plaintiff here, and a six-year old son, Joseph Rivera, Jr. Those survivors now bring this action for wrongful death based on defendant's negligent treatment of Mr. Rivera while he was a patient at the Veterans Hospital.

To assess whether defendant was negligent, the court must determine, as an issue of fact as well as an issue of law, whether defendant departed from accepted standards of care by: performing seven (7) bypass grafts during the cardiac bypass surgery; not transfusing the patient post-surgically or when his hematocrit dropped, and instead maintaining him on saline solution and a potent drug; and not properly performing procedures during the "code." If defendant did depart from accepted standards of care, to find liability, the court must conclude whether that negligence was the proximate cause of decedent's death. In addition, the court must establish the amount of damages, if any, recoverable.

Plaintiff must convince the court of her case by a preponderance of the evidence.

## I. NEGLIGENCE

◼ The court finds that defendant's conduct—as evidenced by decisions to perform seven bypasses and not to transfuse post-operatively or when Mr. Rivera's hematocrit dropped below twenty, as well as failure to communicate and a poorly conducted code—departed from accepted standards of care.

First, the court finds that seven bypasses were not indicated in Mr. Rivera, according to accepted standards of care. Three of the seven vessels bypassed were extremely small—less than 1.5 millimeters in diameter. Doctor Avery described the bypass of very small vessels (those under 1.5 millimeters) as essentially superfluous; it only serves to increase cross-clamp time. Furthermore, defendant's own expert, Doctor Sanders, admitted that smaller vessels generally were not bypassed as long as the patient had other more appropriate vessels for bypass. Doctor Sanders' article established a 1.5-millimeter vessel diameter as an important anatomical criterion for that vessel's bypass. Moreover, Doctor Lester thought that a substantial number of Miami physicians would not have bypassed such small vessels (1.2 millimeters).

Another of the vessels bypassed was only 30% blocked. Doctor Avery noted that he would never bypass a vessel only 30% narrowed. Doctor Sanders' studies only involved the bypass of vessels that were greater than 50% obstructed—what

the doctor described as "sort of the cut off." Record at 495.

Finally, a seven-bypass operation is rare: Doctor Sanders has performed only 10 to 15 seven-bypass operations out of 5,000 to 10,000 patients at his well-respected center at Northwestern; in the Miami community, the average number of bypasses performed on a hypothetical individual was 2.5; even Doctor Lester averaged only between 4.2 and 4.5 grafts per heart surgery.

To bypass seven vessels amounted to an attempted total revascularization of Mr. Rivera, which could only be safely undertaken in an atmosphere of total care and team approach to medicine. The Veterans Hospital in Miami was not a leading heart surgery center. A complete approach to care for Mr. Rivera was necessary to counteract the trauma of an extended cross-clamp time precipitated by a seven-bypass operation. Moreover, the anesthesia that Doctor Lester chose for the operation posed significant post-operative risks for a seven-bypass patient that only cautious post-surgical care could counter. To proceed with seven bypasses, where three of the vessels were smaller than those which other physicians would normally bypass, and where one vessel was only 30% occluded and would not be bypassed at all by other physicians, and where defendant's physicians would not follow through with transfusion (Doctor Lester revealed a stubborn reluctance to transfuse throughout) and total care (the doctors also knew the limitations of care in their facility), represented a deviation from accepted standards of care.

Second, failure to transfuse represented a departure from accepted standards of care. Doctor Krucoff testified that "[t]he most physiologic and ... effective way to ... [increase] Mr. Rivera's blood pressure would have been to give him packed red blood cells." Record at 333. Defendant's own expert, Doctor Sanders, testified that red cells represented the best volume replacement that would stay in the patient's system. At the very least, defendant should have administered non-blood products other than saline solution which would not diffuse into surrounding tissue.

Instead of transfusing him, Doctor Lester kept Mr. Rivera on Levophed—a potent drug which constricts blood vessels—to maintain his blood pressure. Defendant's expert, Doctor Sanders, would have avoided using Levophed if possible, and, if he had to use it, he would have administered it at a lower dosage. Neither would Doctor Sanders have used the anesthesia employed by Doctor Lester during surgery, especially because that anesthesia required defendant's doctors to use Levophed post-surgically (that anesthesia, Sufentunyl, is most prone to cause vasoldilation). Doctor Lester himself usually does not administer Levophed for more than two days after surgery. The doctors' post-operative strategy kept Mr. Rivera in a depleted state. The combination of the use of the particular anesthetic and then continued use of Levophed, and a failure to transfuse, represented a departure from what defendant's and plaintiff's experts would have done, and accepted standards of care.

The doctors' failure to transfuse in response to a consistently low hematocrit level also departed from accepted standards of care. Doctor Pinon, defendant's resident physician, testified that he observed that Mr. Rivera had a low hematocrit and attributed it to blood loss during surgery. He ordered a repeat blood count for that reason. In addition, Doctor Hill noted Mr. Rivera's low hematocrit and debated transfusion. Doctor Lester was aware that Mr. Rivera's hematocrit was below 20 on two consecutive occasions, and admitted that he normally transfused patients with similar readings. Doctor Lester also admitted that most centers would have transfused Mr. Rivera at a 20 hematocrit reading. For Mr. Rivera, however, Doctor Lester proceeded to administer saline solutions instead of blood, or any other more effective substance. Mr. Rivera was never transfused, even as his hematocrit dropped to lower and lower levels.

Third, the court finds that defendant departed from accepted standards of care by improperly conducting the "code." Two factors contributed to negligence: the

team's failure to communicate with and inform each other, and to manage and monitor the patient; and the resident physician's poor response to that condition.

Doctor Fonts, the second-year resident who was responsible for intensive-care-unit patients the night of Mr. Rivera's death, had little or no information about Mr. Rivera's medical history. Doctor Fonts' ignorance resulted in part from his own failure to learn of Mr. Rivera's condition, either when he prescribed the anti-nausea medication or when he responded to the code. He testified that he could not recall discussing Mr. Rivera's condition with the physician going off call. A few hours before the code, Doctor Fonts had prescribed an anti-nausea medication for Mr. Rivera without even seeing or evaluating him. In addition, Doctor Fonts did not review Mr. Rivera's chart before he began resuscitative efforts. In sum, the physician responsible for Mr. Rivera's care that night knew only that Mr. Rivera was having a seizure, and he attempted to address that condition in isolation from any other.

In addition, the other doctors did not inform Doctor Fonts of Mr. Rivera's condition. Defendant's doctors knew of Mr. Rivera's low hematocrit readings, did not transfuse, and then allowed him to pass the night without an attending physician familiar with his case. Doctor Krucoff testified to the importance to the patient of staff communication in post-operative care of this kind. Defendant's "haphazard" approach to care constituted a departure from accepted standards of care.

Further, Doctor Fonts improperly performed procedures associated with the code. He did not acquaint himself with the patient's history. He failed to establish a breathing passageway: the blood gas lab report revealed that resuscitation efforts had little effect. Doctor Fonts admitted that he incorrectly placed the breathing tube in Mr. Rivera's esophagus. Arguably, Doctor Fonts could have adequately oxygenated Mr. Rivera with the air bag. Regardless, Doctor Fonts testified that Mr. Rivera had no adequate airway for about four minutes. The lab reports taken during the code confirm that Doctor Fonts' efforts had no effect.

Doctor Fonts' unsuccessful attempt to establish an airway distracted him from addressing Mr. Rivera's low blood volume. While this reflects poorly on Doctor Fonts' ability to oxygenate Mr. Rivera or confront such an emergency situation, it results more directly from his fellow doctors' failure to communicate to him the seriousness or even the nature of Mr. Rivera's condition. Moreover, Mr. Rivera would not have faced the additional complication of low blood volume/pressure if defendant's doctors had transfused him earlier.

In conclusion, defendant was negligent in its care of Mr. Rivera in that its doctors departed from accepted standards of care in the above-outlined instances.

## II. PROXIMATE CAUSE

Finally, the claimed negligence was the proximate cause of decedent's death; the total course of action pursued by defendant's physicians resulted in Mr. Rivera's death. The combination of seven-bypass surgery, no post-operative transfusion, even in the face of falling hematocrit levels, inadequate team care, and a negligently conducted code proximately caused Mr. Rivera to die. As outlined above, defendant's doctors did seven bypasses on Mr. Rivera, thereby increasing the cross-clamp time, contrary to accepted standards of care; gave him an anesthetic that required the use of a strong blood pressure drug to counteract; did not transfuse Mr. Rivera, even when his hematocrit consistently appeared below 20; continued to administer a strong blood pressure drug, instead of blood; did not communicate among themselves or monitor Mr. Rivera properly or provide information to physicians assigned to cover Mr. Rivera's care; did not take effective and informed measures to resuscitate Mr. Rivera once he seized. The court finds that the totality of defendant's doctors' conduct actually and proximately caused Mr. Rivera's unnecessary death.

## III. DAMAGES

### A. *In Favor of Mrs. Rivera*

■ Mrs. Rivera seeks damages for loss of companionship, loss of protection and

mental pain and suffering, both past and future.

The court finds that Mrs. Rivera has suffered greatly as a result of her husband's unexpected death. Guilt, remorse, loneliness, vulnerability, anxiety and depression plague her. The court need not further attempt to detail or express the immense pain and suffering which have affected and will continue to affect her life.

Evidence exists that Mr. Rivera would have lived another twenty (20) years, if not for the negligent care that he received. During those twenty years, Mr. Rivera would have provided companionship and protection for Mrs. Rivera.

The court finds that Mrs. Rivera should receive the full $500,000.00 damages which she seeks against defendant.

### B. *In Favor of Joey*

Mrs. Rivera seeks damages in favor of Joseph Rivera, Jr. (Joey) for pain and suffering, and loss of companionship, instruction and guidance—both past and future.

Joey was cheated of a father. He will not have that parent in his life as he grows to adulthood, as the court must assume he would have had defendant not acted negligently.

Joey has suffered as a result of his father's death, and he will continue to suffer as he realizes that he will never again have the opportunity to know his father. Joey has lost a parent and cannot retrieve him. He will suffer great pain from this knowledge.

The court finds that Joey should receive the full $300,000.00 sought. This money shall be deposited directly into a state-authorized guardianship account, as more clearly outlined below.

### C. *Funeral Expenses*

Finally, the court finds that defendant shall pay plaintiff the amount of funeral expenses incurred for Mr. Rivera's burial: $1,559.00.

In accord with the foregoing findings of fact and conclusions of law, and after careful consideration, the court

ORDERS and ADJUDGES that defendant is liable to plaintiff in this action in the amount of $801,559.00 to be paid as follows: $500,000.00 to Mrs. Mary Rivera, $300,000.00 to Joseph Rivera, Jr. (to be deposited directly in his guardianship account, as noted below), with an additional $1,559.00 due to the payor of Mr. Rivera's funeral expenses—his estate, as far as the court can discern. The court further

ORDERS and ADJUDGES that Mrs. Rivera SHALL APPLY TO THE APPROPRIATE STATE COURT FOR ESTABLISHMENT OF A GUARDIANSHIP FOR JOSEPH RIVERA, JR. This account shall exist and be managed for the benefit of Joseph Rivera, Jr., according to state law. The court further

ORDERS and ADJUDGES that defendant SHALL DEPOSIT the $300,000.00 designated as an award to Joseph Rivera, Jr. DIRECTLY INTO SAID GUARDIANSHIP ACCOUNT. The court further

ORDERS and ADJUDGES that defendant's motion to strike the report of plaintiff's expert, Dr. James Avery, which plaintiff attached to her final argument and summary of evidence is hereby GRANTED, and said report was not considered by the court in arriving at its decision herein.

DONE and ORDERED.